# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

KIMBERLY K. KINSETH,

              Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

              Defendant.

No. C 12-3033-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING REPORT AND
RECOMMENDATION**

---

## TABLE OF CONTENTS

I.    **INTRODUCTION**................................................................2
    A.   *Procedural Background* ...............................................2
    B.   *Factual Background* ....................................................3
        1.   *Summary of medical evidence* .........................3
            *a.*   *Medical evidence of physical impairment* .....................3
            *b.*   *Medical evidence of mental impairment* ......................7
            *c.*   *State agency consultants* ......................................10
            *d.*   *Kinseth's testimony* ...........................................12
            *e.*   *Vocational expert's testimony*................................14
        2.   *Summary of the ALJ's decision* .......................15

II.   **ANALYSIS** ................................................................17
    A.   *Standard of Review* ...................................................17
    B.   *Kinseth's Objections* .................................................22
        1.   *Discounting Dr. Gibson*................................24
        2.   *Discounting Dr. Ahrendsen* ............................26
        3.   *Discounting Dr. Johnson* ..............................29
        4.   *Giving "significant weight" to Dr. Woodard and Dr.
            Griffith* ......................................................30

III.   **CONCLUSION** ............................................................31

This case is before me on a Report And Recommendation (R&R) (docket no. 10) from Magistrate Judge Leonard Strand recommending that I affirm a decision by the Social Security Commissioner (the Commissioner) denying Plaintiff Kimberly Kinseth (Kinseth) disability insurance benefits (DIB) under Title II of the Social Security Act. On April 11, 2013, Kinseth filed objections to the R&R (docket no. 11). On April 19, 2013, Defendant filed a three-sentence response summarily opposing Kinseth's objections (docket no. 12). For the reasons discussed below, I decline to accept the R&R and instead remand this case to the Commissioner for further proceedings.

## I.  INTRODUCTION

### A.  *Procedural Background*

Judge Strand summarized this case's procedural background as follows:

> Kinseth protectively filed for DIB on May 29, 2009, alleging disability beginning on October 10, 2008, due to bipolar disorder, fibromyalgia, degenerative disc disease, arthritis, bulging disk, asthma and depression. AR 192-205. Her claims were denied initially and on reconsideration. AR 61-73. Kinseth requested a hearing before an Administrative Law Judge ("ALJ"). AR 74. On April 14, 2011, ALJ John E. Sandbothe held a hearing during which Kinseth and a vocational expert ("VE") testified. AR 32-55.

> On April 25, 2011, the ALJ issued a decision finding Kinseth not disabled since October 10, 2008. AR 9-31. Kinseth sought review of this decision by the Appeals Council, which denied review on April 5, 2012. AR 1-3. The ALJ's decision thus became the final decision of the Commissioner. 20 C.F.R. §§ 404.981.

> On May 18, 2012, Kinseth filed a complaint in this court seeking review of the ALJ's decision. This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for the filing of a report and recommended disposition of the case.

2

Report And Recommendation 1-2 (docket no. 10). On August 29, 2012, Kinseth filed a brief (docket no. 7) requesting that Judge Strand reverse the ALJ's decision because (1) the ALJ failed to give good reasons for rejecting the opinions of Kinseth's three treating physicians, and (2) the ALJ gave too much weight to the opinions of non-treating state agency consultants. On October 15, 2012, the Defendant filed a brief (docket no. 8) requesting that Judge Strand affirm the ALJ's decision, arguing that the ALJ properly evaluated the medical opinions and that substantial evidence supported the ALJ's decision.

After reviewing the parties' briefs, Judge Strand issued his R&R on April 4, 2013, recommending that I affirm the ALJ's decision (docket no. 10). On April 11, 2013, Kinseth timely filed objections to the R&R (docket no. 11), which essentially re-assert the arguments made in Kinseth's earlier brief. Finally, on April 19, 2013, the Defendant filed a response to Kinseth's objections (docket no. 12), incorporating the arguments made in Defendant's earlier brief. I must now decide whether to accept or reject the R&R in light of Kinseth's objections.

### B. Factual Background

In his R&R, Judge Strand made thorough findings of fact. Report And Recommendation 2-14 (docket no. 10). Neither party has objected to these factual findings. I therefore adopt the findings of fact from the R&R, which are set forth below.

#### 1. Summary of medical evidence

##### a. Medical evidence of physical impairment

Kinseth began seeing Mark Johnson, M.D., at Mercy Internal Medicine Clinic in 2007 for her fibromyalgia and chronic back pain. AR 393-95. Dr. Johnson prescribed

Lortab three times per day under a pain contract.[1]  *Id.*  In November 2007, Dr. Johnson noted her back pain was "quite well controlled."  AR 393.  Dr. Johnson also prescribed medication for Kinseth's mood disorder with sleep disorder.  AR 391.  He suggested she transfer to a primary care provider in 2008, but Kinseth continued seeing Dr. Johnson for several issues and he continued prescribing her medication.  AR 387, 388, 390.

In May 2009, Dr. Johnson wrote that Kinseth had fairly typical symptoms of fibromyalgia and had carried this diagnosis for much of her adult life.  AR 383.  He noted that her symptoms waxed and waned and she would have weeks where she was comfortable and weeks when she was debilitated.  *Id.*  He wrote, "Even simple exercise can exacerbate her pain, especially upper shoulder neck pain and sometimes lower extremity limb and girdle discomfort."  *Id.*

Kinseth began seeing Jennifer Gibson, M.D., for back pain in July 2009.  AR 446.  Kinseth noted that her pain worsened with increased activity.  *Id.*  She explained if she pushed herself when her pain felt under control, it would flare up and she would have to spend the next two to three days in bed.  *Id.*  Dr. Gibson spoke with Kinseth about time management and pacing, suggesting this could help control some of her pain symptoms.  AR 447.  She asked that

---

[1] Despite this pain contract, it appears from the record that Kinseth was receiving Lortab prescriptions from two different providers from 2007 through 2009.  Kinseth was initially prescribed Lortab by David Ruen, M.D., in April 2005 with instructions to use it sparingly.  AR 322.  Dr. Ruen noted that she was not to use Soma in the future.  *Id.*  By October 2007, Kinseth had transferred her care to Glee Christ, ARNP, at Belmond Medical Center and Dr. Johnson at Mercy, both of whom prescribed Lortab.  AR 367, 395.  Ms. Christ originally prescribed Lortab and Soma three times per day, but decreased the prescriptions to two times per day in October 2007.  *Id.*  In February 2008, she noted Kinseth was pleading with her to increase the dosage but she was uncomfortable with Kinseth's excessive use of Lortab and Soma.  AR 364.  She noted that an extensive workup had been done with negative results and that a MRI showed very mild degenerative disk disease at L5-S1 but was otherwise unremarkable.  *Id.*  Kinseth continued receiving Lortab and Soma prescriptions from Ms. Christ until at least February 2009 and Lortab from Dr. Johnson until July 2009 when her medication management was transferred to another provider.  AR 353, 448.

Kinseth get a urine drug screen before her next appointment so they could transfer her medication management from Dr. Johnson and set up a pain contract. AR 448.

Kinseth did not come in for a drug screen before her next appointment, stating she had been busy with her grandchildren. AR 445. She provided a urine sample at the appointment and was given a three-week supply of her prescriptions to last until her next scheduled appointment. *Id.* The drug screen came back positive for amphetamine. AR 444. Kinseth said she had borrowed Adderall from a friend. *Id.* She apologized and said it would never happen again. Dr. Gibson discussed the pain contract for her Lortab prescription. *Id.* She wrote that a drug screen would be performed at every visit for the next six months. *Id.*

In October 2009, a MRI of Kinseth's spine was taken. AR 476-81. The results were summarized in a letter from David Ruen, M.D., on October 6, 2009. AR 487.

> The results of your recent x-ray showed essentially no evidence of arthritis, degenerative disease or other problems. There were a couple of benign pelvic calcifications but it was otherwise unremarkable. Your neck x-ray showed minimal arthritis at C4-5 and an unfused accessory ossification center at C2-3. Your MRI scans of these areas showed a broad based disk bulge left greater than right at the C4-5 level. You had normal cord signal throughout the neck. There was no abnormal enhancement. Your MRI scan of the lumbar spine showed mild interspaced narrowing without evidence of significant arthritis. There was no spinal canal narrowing. There was minimal bulging. There was no evidence of any kind of tears and certainly no herniated disk or even bulging disks. Congratulations on these very excellent results. I look forward to our next visit.

On November 11, 2009, Dr. Gibson discussed Kinseth's functional abilities with her and made the following record:

1.      She finds that pain interferes with her ability to lift weights.  She can only lift five to ten pounds of weight occasionally because this does bother her neck and back.

2.      The patient is not able to sit for more than 20 minutes or stand for more than 20 minutes without needing to take a break or change position.  She can only walk one block before she has to sit down.

3.      She has discomfort with stooping, kneeling, climbing, and crawling, and I would suggest that she avoid these activities completely.

4.      She is capable of sight, hearing, speech. Travel would be limited by the restrictions on sitting, standing, and walking, handling of small objects with her hands.  She does have swelling with prolonged use of both her hands and her feet.

5.      We also talked about the fact that she has trouble working for prolonged periods.  She did do house chores a few weeks ago.  She worked about six hours straight and took 10-minute breaks as if she was at work, and by the end of the evening had to go [to] the emergency room with pain and swelling.

She does have flare-ups of her fibromyalgia.  Some days are better than others.  On the flare-up days, she may have pain that is severe enough that she needs to lie down for most of the day.

We have talked about pacing.  I have suggested that she not work for more than 20 or 30 minutes without taking a more extensive break, possibly a 20 to 30-minute break, and she has tried to follow that in her daily life.

AR 527-28. On November 20, 2009, Dr. Gibson completed a questionnaire at the request of Kinseth's attorney. AR 558-59. She wrote that Kinseth could not stand or sit for more than 20 minutes at a time without experiencing pain and she could not kneel, climb, crawl or stoop. *Id.* She suggested that Kinseth's impairments would affect her attendance at work and her ability to perform under pressure. She also noted that Kinseth's concentration was impaired. *Id.* She stated a flare up of fibromyalgia pain could cause Kinseth to miss work. She also reported Kinseth's chronic pain was unlikely to improve and impaired Kinseth's daily functioning. *Id.*

On January 5, 2010, Dr. Gibson expressed concern that Kinseth may have been receiving her Vyvanse prescription from a second provider. AR 596. She also noted that Kinseth had requested early refills of her prescriptions on two occasions. *Id.* On one occasion, Kinseth requested an early refill stating she had lost her luggage while traveling. *Id.* Dr. Gibson denied this request. *Id.* On January 6, 2010, Kinseth reported that Dr. Johnson would no longer prescribe her Vyvanse because he believed she was seeking the prescription from multiple providers. Dr. Gibson also refused to prescribe Vyvanse, noting that Robert Stern, D.O., thought she should not take that medication. AR 595. Dr. Gibson stated that any prescription for Vyvanse would have to come from a psychiatrist. *Id.*

### b. Medical evidence of mental impairment

On February 1, 2008, Dr. Johnson noted that Kinseth reported significant problems with sleep disorder and mood disorder. AR 424. She improved while taking Depakote but stopped using it. Dr. Johnson advised her to continue taking it and increased her prescription. *Id.* Later that month, Kinseth sought help for exacerbation of her depression from Glee Christ, ARNP, at Belmond Medical Center. AR 364. Her Effexor prescription was increased.

*Id.* On May 9, 2008, Ms. Christ noted that Kinseth's moods were stabilized and she had been sleeping well. AR 363.

On May 12, 2009, Kinseth reported to Dr. Johnson that she thought she had bipolar disease. AR 387. Based on her description of symptoms, he noted, "I do think she is correct" and he prescribed Lamictal. AR 383-87.

In July 2009, Kinseth saw R.M. Ramos, M.D., at Mental Health Center of North Iowa for evaluation of attention deficit disorder. AR 440. She explained that she did not have symptoms of hyperactivity, but had difficulties concentrating on one task and finishing things she would start. Dr. Ramos indicated he wanted to perform more tests before diagnosing her and prescribing medication. AR 441.

On August 13, 2009, Brent Seaton, Ph.D., performed a neuropsychological evaluation for diagnostic clarification and treatment planning regarding Kinseth's bipolar disorder and possible attention deficit/hyperactivity disorder ("ADHD"). AR 400. Dr. Seaton concluded Kinseth's full scale IQ was 77, which is within the borderline range of general intellectual functioning. AR 405. Dr. Seaton noted that she was likely prone to difficulties interacting with people, especially those in positions of authority. AR 407. He diagnosed her with bipolar II disorder and gave her a provisional diagnosis of ADHD, stating that he needed more objective evidence. *Id.* He suggested that medication and individual therapy would be helpful. AR 408.

Dr. Johnson wrote a letter on behalf of Kinseth on October 8, 2009, stating:

> She has been unable to work because of her underlying bipolar type II disorder. She also has chronic pain syndrome which is not under my direct care, the patient seeing Dr. Jennifer Gibson for this reason, but this has also been debilitating.
>
> She requires multiple drug therapy for mood stabilization and with the contingent comorbidities of

psychiatric illness and drug side effects, she is unable to perform any type of work at this time.

This letter is to document her chronic pain syndrome as well as her history of bipolar depression and I am supporting her filing for disability because of her long-standing debility.

AR 504.

Kinseth began seeing Jon Ahrendsen, M.D., in February 2010 for ADHD. AR 626-27. Dr. Ahrendsen suggested she try methyl B-12 injections for ADHD and fibromyalgia in addition to a trial of stimulant medication. AR 628. Kinseth later called saying she would like to try Adderall, noting she had taken it before and did not have any side effects. AR 628-29. Dr. Ahrendsen prescribed Adderall. *Id.* Kinseth reported the Adderall made her feel better, although it would wear off after approximately four hours. AR 625. Dr. Ahrendsen conducted an attention assessment test and increased the dosage. *Id.* On August 2, 2010, Kinseth called in to get an early refill on her Adderall stating she had been in a car accident and lost her medication. AR 622. Dr. Ahrendsen found an on-call provider who was willing to prescribe enough medication to last until her next refill date if Kinseth brought in a police report. *Id.* Dr. Ahrendsen's office tried calling Kinseth multiple times and left multiple voicemails for her on August 2, 3, 4, and 5, but she never called back and did not get an early refill. *Id.* Medication management of Kinseth's Lortab prescription was transferred to Dr. Ahrendsen from Dr. Gibson in September 2010. AR 633-34.

Dr. Ahrendsen wrote a letter on March 28, 2011, to confirm Kinseth's diagnosis of ADHD. AR 661. He wrote that he had been treating her for ADHD for several years and she had improved with proper medication management. *Id.* He indicated that she still suffers difficulty with focusing and maintaining attention for a long period of time. He noted that Kinseth suffers from bipolar features, chronic

depression and chronic back pain. He stated her back pain results in physical limitations of lifting, bending, walking and carrying. *Id.* He concluded, "I believe Kimberly has a sufficient number of medical problems including bipolar issues, depression issues, ADHD issues, chronic back pain issues that her application for disability is a reasonable one." *Id.*

### c.    *State agency consultants*

Scott Shafer, Ph.D., performed a mental residual functional capacity ("RFC") assessment and psychiatric review technique on September 22, 2009. AR 457-74. He found that she had moderate limitations in her ability to understand, remember, and carry out detailed instructions and maintain attention and concentration for extended periods. AR 457-58. In all other areas she was not significantly limited. *Id.* Dr. Shafer summarized the medical evidence and Kinseth's daily activities. AR 459. He found her severe mental impairment did not meet or equal a listing. He noted that she was able to sustain employment in the past and stopped working due to her medications. *Id.* Her Global Assessment of Functioning ("GAF")[2] scores of 50 to 55 indicated a moderate level of impairment and her daily activities showed that she can handle daily responsibilities and negotiate the community independently. *Id.* He found that her attention, concentration, and pace are adequate for routine tasks not requiring sustained attention and she can interact appropriately with the public, coworkers, and supervisors. *Id.* Her judgment was also adequate to adjust to changes in the workplace. In his psychiatric review technique, he found moderate difficulties in maintaining concentration, persistence, or pace, mild difficulties with activities of daily

---

[2] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. *See* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed.) (DSM-IV). A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

living and maintaining social functioning, and no episodes of decompensation. AR 471.

Melodee Woodard, M.D., performed a physical RFC assessment on October 7, 2009. AR 488-95. She found that Kinseth could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, could stand and/or walk about 6 hours in an 8-hour workday and could sit for the same. AR 489. She could also be expected to occasionally climb, balance, stoop, kneel, crouch or crawl. She was to avoid any overhead reaching and concentrated exposure to extreme cold and hazards such as machinery or heights. AR 491-92. Dr. Woodard noted that in December 2008, July 2009, and August 2009, Kinseth reported Lortab was "quite helpful" in relieving her symptoms. AR 495. She also noted attempts by Kinseth's physicians to wean her off narcotics. *Id.* As for her fibromyalgia, Dr. Woodard noted Kinseth had not sought treatment for diffuse pain before July 2009 and it was unclear who initially gave her this diagnosis. *Id.* Kinseth reported the TENS unit helped and Dr. Gibson recommended time management and pacing in addition to treatment to relieve her symptoms. *Id.* Finally, Dr. Woodard noted that testing revealed that Kinseth had a tendency to potentially exaggerate the nature of her complaints and that she attributed the loss of her 26 jobs to non-physical impairments. *Id.*

Sandra Davis, Ph.D., performed a mental RFC assessment and psychiatric review technique on December 21, 2009. AR 560-77. Dr. Davis noted that Kinseth's claim was being reconsidered due to new allegations that Kinseth was more forgetful and less able to concentrate. AR 576. In addition to the moderate limitations previously identified by Dr. Shafer, she also found moderate limitations in her ability to: perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to

perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. AR 574-75. In all other areas she was not significantly limited. *Id.*

In summary she wrote:

> [T]he claimant has some problems with understanding and carrying out more detailed tasks. She would have fluctuating attention and concentration. Pace will be slower than that of others. She may have difficulty relating to authority, and be distracting to others. She is doing less in terms of her household activities and ADL's at present. She has pursued stimulants for her possible ADHD, but has done some of that without medical supervision. [Treating source] opinion is from a physician she no longer sees and whose specialty is not mental health; as such, more weight is given to those mental health practitioners she has seen.

AR 577. Dr. Davis also noted that Kinseth's credibility could be challenged based on her seeking stimulants from two sources and borrowing medication from a friend, as well as her husband's reports which indicated more positive daily functioning than Kinseth herself did. *Id.*

### d.    Kinseth's testimony

At the hearing, Kinseth testified she completed twelfth grade and had taken additional classes in cosmetology and nursing. AR 35. She said she had been in special education throughout high school for language and math. *Id.* She testified that she has problems with memory, concentration and staying on task. AR 36. She thought she could stay on task for 15 minutes at a time and had greater difficulty concentrating when other people were around her.

AR 37. Kinseth testified that her difficulties with lifting, sitting and staying on task in addition to her mental impairments prevent her from working. AR 38.

As for mental impairments, Kinseth testified that her bipolar disorder causes irregular sleeping patterns. She sometimes slept four days in a row and other times she could only sleep for a couple hours. *Id.* She said her ADHD made her argumentative and she had trouble getting along with people. AR 39. She reported that she often challenged her supervisors in past jobs and lost jobs for that reason. AR 40-41. Kinseth said she would normally stay at a job for no more than three months. AR 41. She reported missing 28 days out of two months at her last job as a nurse's aide. *Id.* She said she also had a tendency to become obsessed with simple tasks so that she would spend the majority of the day working on one thing. AR 39-40.

With regard to physical impairments, Kinseth stated that she needed to switch positions at least every 40 minutes. AR 42-43. She described difficulties with lifting, standing and sitting related to her fibromyalgia pain. *Id.* She said the more she pushes herself, the more pain she experiences, and she is taking the maximum dosage that is recommended of her medication. *Id.* In describing her fibromyalgia pain, Kinseth said it radiates out from a spot in her shoulder. AR 43. As for back pain, Kinseth said her doctors have told her to switch positions when she experiences soreness. *Id.* Her medication does not stop the pain. She thought she could stand for 40 minutes and sit for 45 minutes before needing to switch positions. AR 43-44. She stated she is able to walk two to three blocks. AR 44. She also described difficulties with bending, kneeling and lifting. AR 44-45.

On a typical day, Kinseth stated that she would watch television, read and get on the computer. She would try to go to doctor's appointments when she had them, but would often re-schedule them because she did not want to leave her house. AR 45-46. She testified she did not do housework, yard work, or take care of her pets, and that other people

would help her out with these things. *Id.* She explained that if she tried to do things such as vacuuming, she would be sore the next day. AR 46. Kinseth said she would sometimes go visit places with the help of a friend to share her story about her prior drug use. AR 46-47. She has been clean for 10 years. AR 47. Someone would usually go grocery shopping with her or she would give a list to someone else. She said that if she went by herself, she would spend too much time in the store and buy more than she intended. *Id.* She testified that she sometimes has problems taking care of herself and her daughter would have to remind her to take a shower. AR 48. She stated that any changes in routine would cause her stress, which would exacerbate her symptoms. AR 49. Kinseth thought she would be unable to return to any of her past jobs because she would argue with people. AR 51.

### e.      *Vocational expert's testimony*

The ALJ summarized Kinseth's vocational and medical background then gave the VE the following hypothetical:

> She could lift 20 pounds occasionally, 10 pounds frequently; she could only occasionally balance, stoop, crouch, kneel, crawl, climb; simple routine, and repetitive work; no contact with the public; regular pace.

AR 52. The ALJ stated he did not believe any of Kinseth's past work would be available under this hypothetical, but asked the VE if there were other jobs she could perform. *Id.* The VE answered that the jobs of routine clerk, laundry folder and housekeeper were available within these limitations and existed in significant numbers within Iowa and the national economy. AR 52-53.

The second hypothetical provided by the ALJ contained the same limitations as before with additional limitations of standing for a total of two hours during the workday, two or more absences per month and slow-paced

work for up to one-third of the day. AR 53. The VE responded that a person with these limitations and Kinseth's vocational and medical background would not be competitively employable. *Id.*

Kinseth's attorney also asked the VE hypotheticals. He first asked if any of the jobs from the first hypothetical would be affected if the individual needed to take a 20-minute break after every 20 to 30 minutes of work. *Id.* This was based on a treatment note from Dr. Gibson. *Id.* The VE answered that an individual who required two or more unscheduled breaks per day would not be competitively employable on a full-time basis. AR 53-54. Kinseth's attorney also asked if any of the jobs from the first hypothetical would be affected if an individual could only stay on task 10 to 15 minutes at a time without completing her tasks. AR 54. The VE responded 'yes.' *Id.* Finally, the attorney referenced Kinseth's testimony about her confrontational behavior towards supervisors. *Id.* The VE stated that not many employers would tolerate frequent conflict in the workplace on a regular basis. AR 54-55.

## 2. *Summary of the ALJ's decision*

The ALJ made the following findings:

(1) The claimant meets the insured status requirements of the Social Security Act through June 30, 2013.

(2) The claimant has not engaged in substantial gainful activity since October 10, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*).

(3) The claimant has the following severe impairments: subaverage intellectual functioning; fibromyalgia; bipolar disorder; and ADHD (20 CFR 404.1520(c)).

(4) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR part

404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

(5)     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) such that she can lift and carry twenty pounds occasionally, ten pounds frequently; occasionally balance, stoop, kneel, crouch, crawl, and climb; she is limited to simple routine repetitive work; she can have no contact with the public; and she can work at no more than a regular pace.

(6)     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

(7)     The claimant was born on April 1, 1961 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.     The claimant subsequently changed age category to closely approaching advanced age (20 CFR 404.1563).

(8)     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

(9)     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR 404, Subpart P, Appendix 2).

(10)   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

> (11) The claimant has not been under a disability, as defined in the Social Security Act, from October 10, 2008, through the date of this decision (20 CFR 404.1520(g)).

AR 14-25.

## II.  ANALYSIS

### A.  Standard of Review

I review Judge Strand's R&R under the statutory standards found in 28 U.S.C. § 636(b)(1):

> A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.  The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28. U.S.C. § 636(b)(1) (2006); *see* Fed. R. Civ. P. 72(b) (stating identical requirements); N.D. Ia. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but not articulating any standards to review the magistrate judge's report and recommendation).  While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask.  Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985).  Thus, a district court may review *de novo* any issue in a magistrate judge's report and recommendation at any time.  *Id.*  If a party files an objection to the magistrate judge's report and recommendation, however,

the district court *must* "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

*De novo* review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19 (2004) (noting *de novo* review is "distinct from any form of deferential review"). The *de novo* review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, while *de novo* review generally entails review of an entire matter, in the context of § 636 a district court's *required de novo* review is limited to "*de novo* determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any issue need only ask."). Consequently, the Eighth Circuit Court of Appeals has indicated *de novo* review would only be required if objections were "specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger *de novo* review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate."

18

*Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit Court of Appeals has been willing to "liberally construe[]" otherwise general pro se objections to require a *de novo* review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full *de novo* review" if the record is concise. *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require *de novo* review, it is clear to this court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate."). Therefore, I will strive to provide *de novo* review of all issues that might be addressed by any objection, whether general or specific, but will not feel compelled to give *de novo* review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting *de novo* review with "clearly erroneous standard" of review, and recognizing *de novo* review was required because objections were filed). The United States Supreme Court has stated

that the "foremost" principle under the "clearly erroneous" standard of review "is that '[a] finding is "clearly erroneous" when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Medical Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed." *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than *de novo* is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads me to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; see also Fed. R. Civ. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, I believe one further caveat is necessary: a district court always remains free to render its own decision under *de novo* review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard

appropriate in this context, it is not mandatory, and I may choose to apply a less deferential standard.[3]

---

[3] The Eighth Circuit Court of Appeals, in the context of a dispositive matter originally referred to a magistrate judge, does not review a district court's decision in similar fashion. The Eighth Circuit Court of Appeals will either apply a clearly erroneous or plain error standard to review factual findings, depending on whether the appellant originally objected to the magistrate judge's report and recommendation. *See United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002) ("Ordinarily, we review a district court's factual findings for clear error . . . . Here, however, the record reflects that [the appellant] did not object to the magistrate's report and recommendation, and therefore we review the court's factual determinations for plain error." (citations omitted)); *United States v. Looking*, 156 F.3d 803, 809 (8th Cir. 1998) ("[W]here the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error."). The plain error standard of review is different than a clearly erroneous standard of review, *see United States v. Barth*, 424 F.3d 752, 764 (8th Cir. 2005) (explaining the four elements of plain error review), and ultimately the plain error standard appears to be discretionary, as the failure to file objections technically waives the appellant's right to appeal factual findings. *See Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (stating an appellant who did not object to the magistrate judge's report and recommendation waives his or her right to appeal factual findings, but then choosing to "review[] the magistrate judge's findings of fact for plain error"). An appellant does not waive his or her right to appeal questions of law or mixed questions of law and fact by failing to object to the magistrate judge's report and recommendation. *United States v. Benshop*, 138 F.3d 1229, 1234 (8th Cir. 1998) ("The rule in this circuit is that a failure to object to a magistrate judge's report and recommendation will not result in a waiver of the right to appeal '"when the questions involved are questions of law or mixed questions of law and fact."'" (quoting *Francis v. Bowen*, 804 F.2d 103, 104 (8th Cir. 1986), in turn quoting *Nash v. Black*, 781 F.2d 665, 667 (8th Cir. 1986))). In addition, legal conclusions will be reviewed *de novo*, regardless of whether an appellant objected to a magistrate judge's report and recommendation. *See, e.g.*, *United States v. Maxwell*, 498 F.3d 799, 801 n.2 (8th Cir. 2007) ("In cases like this one, 'where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error.' We review the district court's legal conclusions *de novo*." (citation omitted)).

Here, Kinseth has objected to some of Judge Strand's findings. Although I will review these findings *de novo*, and Judge Strand's other findings for clear error, I review the Commissioner's decision to determine whether the correct legal standards were applied and "whether the Commissioner's findings are supported by substantial evidence in the record as a whole." *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999)). Under this deferential standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); *see also Page*, 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." (quoting *Haggard*, 175 F.3d at 594)). "If, after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits." *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (quoting *Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir. 1996)). Even if the court would have "'weighed the evidence differently,'" the Commissioner's decision will not be disturbed unless "it falls outside the available 'zone of choice.'" *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (quoting *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006)).

### B. Kinseth's Objections

Kinseth raises two objections to Judge Strand's recommendation that I affirm the ALJ's decision. Kinseth argues (1) that the ALJ failed to give good reasons for discounting the medical opinions of Kinseth's three treating doctors; and (2) that the ALJ gave too much weight to the opinions of non-treating doctors. While Kinseth argues these objections separately in her brief, her two points are highly interrelated.

In short, she argues that the ALJ gave too little weight to the treating doctors, too much weight to the non-treating doctors, and no good reason for the difference.

The ALJ's decision centered on five doctors' opinions. Three of Kinseth's treating doctors—Dr. Gibson, Dr. Ahrendsen, and Dr. Johnson—submitted opinions favorable to Kinseth. Two non-treating doctors—Dr. Woodard and Dr. Griffith—submitted opinions unfavorable to Kinseth. The ALJ gave "significant weight" to the non-treating doctors (docket no. 5-2, at 21-22) and "little" or "no" weight to the treating doctors (docket no. 5-2, at 20, 22). Unsurprisingly, then, the ALJ denied Kinseth benefits. What is surprising is that the ALJ categorically elevated the opinions of the non-treating doctors over those of the treating doctors.

An ALJ may elevate a non-treating doctor's opinion over a treating doctor's opinion, but only in certain cases. Generally, "[a] treating physician's opinion is due controlling weight if that opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2))) (internal quotation marks omitted). But an ALJ may "disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Prosch*, 201 F.3d at 1013 (citing *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir. 1997); *Cruze v. Chater*, 85 F.3d 1320, 1324-25 (8th Cir. 1996)) (internal quotations omitted). "Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." *Id.* (citing 20 C.F.R § 404.1527(d)(2)).

Kinseth argues that the ALJ did not "give good reasons" for discounting Kinseth's treating physicians. I will evaluate the ALJ's reasons for discounting each of Kinseth's treating physicians in turn below.

### 1. *Discounting Dr. Gibson*

The ALJ assigned "very little weight" to the questionnaire Dr. Gibson submitted on Kinseth's behalf. The ALJ explained his reasons for doing so in one sentence, claiming that Dr. Gibson's opinions were "based on a short treating history and are inconsistent with the objective medical evidence in the record" (docket no. 5-2, at 20). There are two problems with this explanation. First, while ALJs may consider the "[l]ength of the treatment relationship" between a doctor and a claimant, 20 C.F.R. § 404.1527(c)(2)(i), the ALJ in this case favored the opinions of doctors who had *no* treating history with Kinseth. Dr. Gibson had personally treated Kinseth on four occasions. The ALJ never explained why a short treatment history hurt Dr. Gibson's opinion, but the lack of *any* treatment history did not hurt the non-treating doctors' opinions.

Second, the ALJ never explained how Dr. Gibson's opinion was "inconsistent with the objective medical evidence in the record." The ALJ did not discuss what the "objective medical evidence" showed, much less point to a single specific conclusion from Dr. Gibson that was "inconsistent" with that evidence. The ALJ briefly noted that Kinseth's "previous x-rays revealed no evidence of arthritis or degenerative disease . . . [and] the MRI of the claimant's neck and low back revealed minimal findings" (docket no 5-2 at 20). But, the ALJ never connected this observation to his determination that Dr. Gibson's conclusions contradicted the record evidence. The record shows that Dr. Gibson treated Kinesth for fibromyalgia, a condition that Dr. Gibson noted could flare up causing Kinseth to miss work (Ex. 21F; docket no. 5-9, at 119). The ALJ never explained how the x-ray and MRI evidence related to Kinseth's

fibromyalgia (or any of Kinseth's other conditions for that matter). Simply put, the ALJ's one-sentence justification for discrediting Dr. Gibson's opinion—without more—cannot qualify as a "good reason" for discounting a treating physician's opinion.

Judge Strand offered an additional reason in support of the ALJ's decision. Judge Strand noted that it was not clear whether Dr. Gibson based her opinion on an independent medical finding, or simply on Kinseth's subjective description of her alleged disability. Report And Recommendation 23 (docket no. 10). Judge Strand based this observation on a page from Dr. Gibson's clinical notes in which Dr. Gibson lists a number of Kinseth's physical limitations:

> 1.     She finds that pain interferes with her ability to lift weights. She can only lift five to ten pounds of weight occasionally because this does bother her neck and back.

> 2.     The patient is not able to sit for more than 20 minutes or stand for more than 20 minutes without needing to take a break or change position. She can only walk one block before she has to sit down.

> 3.     She has discomfort with stooping, kneeling, climbing, and crawling, and I would suggest that she avoid these activities completely.

> 4.     She is capable of sight, hearing, speech. Travel would be limited by the restrictions on sitting, standing, and walking, handling of small objects with her hands. She does have swelling with prolonged use of both her hands and her feet.

> 5.     We also talked about the fact that she has trouble working for prolonged periods. She did do house chores a few weeks ago. She worked about six hours straight and took 10-minute breaks as if she was at work, and by the end of the evening had to go [to] the emergency room with pain and swelling.

> She does have flare-ups of her fibromyalgia. Some days are better than others. On the flare-up days, she may have pain that is severe enough that she needs to lie down for most of the day.
>
> We have talked about pacing. I have suggested that she not work for more than 20 or 30 minutes without taking a more extensive break, possibly a 20 to 30-minute break, and she has tried to follow that in her daily life.

(Ex. 20F; docket no. 5-9, at 87). While this list is no doubt based, in part, on Kinseth's descriptions of her pain, much of the list is written as though the points are Dr. Gibson's conclusions. More importantly, the list appears to be consistent with the objective conclusions in the questionnaire Dr. Gibson later sent to Kinseth's attorney (Ex. 21F; docket no. 5-9, at 118-119). Taken together, these factors suggest that Dr. Gibson's observations were her own. If the record contains evidence suggesting otherwise, the ALJ did not discuss it.

In short, the ALJ's one-sentence explanation for discounting Dr. Gibson's opinion, devoid of any specific analysis, cannot constitute a "good reason" for not giving controlling weight to a treating doctor's opinion. This does not mean the ALJ's decision to give little weight to Dr. Gibson's opinion was incorrect, only that the ALJ did not provide a sufficient explanation for doing so.

### 2. *Discounting Dr. Ahrendsen*

Like Dr. Gibson's opinion, the ALJ assigned "little weight" to Dr. Ahrendsen's opinion. The ALJ offered three reasons for doing so: (1) that Dr. Ahrendsen incorrectly claimed in his opinion letter that he had treated Kinseth for "several years," when in fact he had only treated Kinseth a "few times"; (2) that Dr. Ahrendsen's opinions were "inconsistent with the medical evidence of record"; and (3) that Dr. Ahrendsen's opinions were "inconsistent with his own treating notes which indicated

[Kinseth] was doing better with no reported side effects once [she started taking] Adderall in February 2010" (docket no. 5-2, at 22).

The ALJ's first two reasons suffer from the same problems present in the ALJ's decision to discount Dr. Gibson's opinion. First, the ALJ apparently discounted Dr. Ahrendsen's opinion based on his short treatment history with Kinseth without explaining why that was a reason to prefer the opinions of the non-treating doctors with *no* treatment history. Moreover, it is unclear what the ALJ meant when he noted that Dr. Ahrendsen had only seen Kinseth "a few" times, but the record shows that Dr. Ahrendsen saw Kinseth at least seven times (Ex. 27F; docket no. 5-10, at 46-49, 52-54). Second, the ALJ provided no reason at all explaining *how* Dr. Ahrendsen's opinion was "inconsistent with the medical evidence of record."

The ALJ's third reason finds little support in the record. The ALJ found that Dr. Ahrendsen's opinions were "inconsistent with his own treating notes which indicated [Kinseth] was doing better with no reported side effects once [she started taking] Adderall in February 2010." Specifically, the ALJ, and later Judge Strand, found Dr. Ahrendsen's opinion letter (Ex. 28F; docket no. 5-10, at 89) to be inconsistent with one of Dr. Ahrendsen's earlier medical records from August 12, 2010 (Ex 27F; docket no. 5-10, at 621). In his opinion letter, Dr. Ahrendsen opined that Kinseth "has a sufficient number of medical problems including bipolar issues, depression issues, ADHD issues, [and] chronic back pain issues that her application for disability is a reasonable one." In the August 12, 2010, record, Dr. Ahrendsen noted that Kinseth felt as though the Adderall she had been taking "helps a lot," presumably with her ability to focus on tasks. According to the ALJ, Dr. Ahrendsen's opinion and the August 12, 2010, record were inconsistent because the record showed that Kinseth "was doing better with no reported side effects" after taking Adderall.

Again, there are two problems with the ALJ's reasoning. First, the fact that Adderall helped Kinseth—without more—does not necessarily speak to Kinseth's ability to work. The August 12, 2010, record does not relate Kinseth's Adderall use to her ability to work. It simply states that Adderall helps Kinseth. But the fact that a claimant is doing well on medication may not bear on his or her ability to work because "doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity." *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001). Thus, the ALJ "relied too heavily on indications in the medical record that [Kinseth] was doing well" on Adderall. *Id.* (internal quotation marks omitted). The August 12, 2010, record may still be relevant to the ALJ's decision to discount Dr. Ahrendsen's opinion, but the ALJ's use of that record must extend beyond the fact that the record says that Adderall helps Kinseth.

Second, even if Kinseth was doing well on Adderall, that fact does not necessarily contradict Dr. Ahrendsen's conclusion. In fact, Dr. Ahrendsen apparently took Kinseth's success with medication into account in rendering his opinion. He beings his opinion letter by noting:

> I have been treating [Kinseth] for several years period of time now for ADHD and *she has improved with proper medication management. However, she still suffers difficulty with focusing and maintaining attention for a long period of time* due to the fact that this diagnosis was not made at a young age when it should have been done. In addition, Kimberly suffers from bipolar features and chronic depression, as well as chronic back pain.

(Ex. 28F; docket no. 5-10, at 89) (emphasis added). An ALJ does not state a "good reason" for discounting a doctor's opinion where the ALJ points out an inconsistency that, upon closer examination, does not really exist. *Cf. Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005) (holding that it was not inconsistent for a doctor to note a

claimant's inability to pay attention for extended periods, but still conclude that the claimant could understand, remember, and perform short, simple instructions). Because Dr. Ahrendsen's opinion does not necessarily conflict with the August 12, 2010, record, the ALJ's stated reason for discounting Dr. Ahrendsen's opinion is not a good reason.

None of the three reasons the ALJ gave for discounting Dr. Ahrendsen's opinion were sufficiently detailed to be considered "good reasons." They may be correct, but the ALJ failed to support any of his reasons with sufficient facts, drawn from the record evidence.

### 3. *Discounting Dr. Johnson*

Finally, the ALJ gave "no weight" to Dr. Johnson's opinion. The ALJ gave two reasons: (1) that Dr. Johnson's opinion "is quite conclusory, providing very little explanation of the evidence relied on in forming that opinion"; and (2) that "Dr. Johnson's opinion appears to rest on an impairment that is outside his area of expertise" (docket no. 5-2, at 20). After reviewing Dr. Johnson's opinion letter (Ex. 17F; docket no. 5-9, at 64), I agree with the ALJ's conclusion that it is highly conslusory. "[A] treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement." *Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008) (citing *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996)). Dr. Johnson's entire opinion letter is comprised of five sentences, only three of which discuss Kinseth's treatment, and one of those three sentences notes that Kinseth's "chronic pain syndrome . . . is *not* under [Dr. Johnson's] direct care" (emphasis added). Dr. Johnson did not support any of the statements in his opinion with any explanation or reference to specific facts related to Kinseth's treatment. Thus, I conclude that the ALJ provided a good reason for discounting Dr. Johnson's opinion.

Because I conclude that the ALJ properly discounted Dr. Johnson's opinion on the grounds that it was conclusory, I need not address the ALJ's second reason related to Dr. Johnson's expertise. In her brief, Kinseth only challenges the ALJ's second reason.

### 4. Giving "significant weight" to Dr. Woodard and Dr. Griffith

Contrary to his treatment of Kinseth's treating doctors, the ALJ gave "significant weight" to the opinions of two non-treating doctors, Dr. Woodard and Dr. Griffith, both of whom provided opinions supporting the ALJ's decision to deny Kinseth benefits (docket no. 5-2, at 20-22). Kinseth argues that the ALJ erred in giving so much weight to these non-treating physicians. Most of the arguments Kinseth makes in her brief relate to the ALJ's decision to give Dr. Griffith's opinion significant weight. By contrast, Kinseth makes relatively few arguments about the ALJ's decision to give Dr. Woodard's opinion significant weight.

Because the ALJ's decision failed to provide good reasons for discounting two of the three treating physicians, it is difficult to determine whether the non-treating physician's opinions should be entitled to significant weight. For example, if on remand the ALJ is unable to bolster his reasons for discounting the treating physicians, that would suggest that the treating physicians' opinions should be given controlling weight. If, however, the ALJ has good reasons for discounting the treating physicians' opinions, I find that the ALJ likely did not err in relying on the non-treating physicians' opinions. In his R&R, Judge Strand noted that the ALJ provided a "thorough explanation[]" of the non-treating doctors' opinions. I agree with that assessment. In particular, the ALJ summarized at length Dr. Woodard's opinions and the medical evidence Dr. Woodard relied upon (docket no. 5-2, at 18-20).

I note, however, that the ALJ's reliance on Dr. Griffith's opinion seems inconsistent with some of the reasons the ALJ used to discount the treating doctors.

For example, Dr. Griffith had no treatment history with Kinseth, and Dr. Griffith's opinion was every bit as conclusory as Dr. Johnson's. In fact, Dr. Griffith summarily agreed with Dr. Woodard's earlier assessment in one sentence: "The initial RFC remains appropriate and is fully affirmed as written" (Ex. 24F; docket no. 5-10, at 6). Still, Dr. Woodard's more thorough opinion is likely sufficient to justify the ALJ's decision to credit the non-treating physicians, assuming the treating physicians' opinions are not controlling.

On remand, if the ALJ determines that there are "good reasons" for discounting Kinseth's treating doctors' opinions, then I would likely not find that the ALJ erred in giving substantial weight to the non-treating physicians. But, the law requires that the ALJ give "good reasons" for discounting treating physicians, and on the current record, he did not. Thus, I will remand this case to give the ALJ an opportunity to elaborate on the evidence supporting his decision to discount Kinseth's treating physicians.

### III.    CONCLUSION

All three of Kinseth's treating physicians issued opinions favorable to Kinseth, but the ALJ rejected these opinions and relied instead on non-treating doctors' opinions, which were not favorable to Kinseth. The ALJ may have been right to do so. But the ALJ needs to provide good reasons for discounting the seemingly unanimous opinions of Kinseth's treating physicians. The ALJ's curt explanations for preferring the non-treating physician's opinions are simply not detailed enough to be "good reasons."

Without a sufficient record detailing the ALJ's reasons for not giving controlling weight to Kinseth's treating physicians' opinions, I cannot properly evaluate whether the ALJ was correct to elevate the non-treating physicians' opinions over the treating physicians' opinions. Moreover, I cannot independently find new reasons to discredit either the treating or non-treating physicians' opinions. Even under *de novo* review, that would constitute weighing the evidence, which is a power reserved for the ALJ.

*Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). Thus, I will remand this case to the Commissioner to determine whether there are "good reasons" to discount Kinseth's treating physicians and, if there are, to support those reasons with a specific and detailed analysis of the record evidence.

**THEREFORE,**

I decline to accept Judge Strand's R&R. Instead, the Commissioner's decision is reversed, and this case is remanded to the Commissioner for further proceedings consistent with this opinion. The Clerk shall enter judgment against the Commissioner and in favor of Kinseth.

**IT IS SO ORDERED**.

**DATED** this 20th day of August, 2013.

_Mark W. Bennett_
_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA